1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ASHLEY HALE individually, and on              No.  2:18-cv-00209-KJM-DB
     behalf of other members of the general
12   public similarly situated,

13                    Plaintiff,                    ORDER

14        v.

15   MANNA PRO PRODUCTS, LLC,

16                    Defendant.

17

18            Plaintiff Ashley Hale brings this class action suit, on behalf of herself and others

19   similarly situated, against defendant Manna Pro Products, LLC for allegedly deceptive labeling

20   and advertising practices related to rabbit food products produced and distributed by defendant.

21   *See generally* Second Am. Compl. ("SAC" or "complaint"), ECF No. 23.  Plaintiff now moves

22   for preliminary approval of a settlement agreement reached on behalf of the class and certification

23   of the proposed settlement class.  Mot., ECF No. 45.  The motion is unopposed.  *Id.* at 1.  On

24   February 7, 2020, the court held a hearing on the matter.  Counsel Meghan George appeared on

25   behalf of plaintiff; counsel Jennifer Wang appeared by telephone on behalf of defendant.  For the

26   reasons set forth below, the motion is GRANTED.

27

28

1

1  I.        BACKGROUND

2         A.        Factual Background

3            On September 17, 2017, plaintiff, a rabbit breeder and enthusiast, purchased a bag

4  of Manna Pro Select Series Pro Formula Premium Rabbit Feed ("Rabbit Feed") from the TSC

5  Tractor Supply Company in Redding, California.  SAC ¶¶ 17, 19.  The bag was marked with a

6  label prominently stating, "Contains No Corn: Helps Reduce The Risk of Digestive Disorders."

7  *Id.* ¶ 16.  The bag's ingredients label similarly provided no indication corn was present in the

8  feed.  *Id.*  The next day, on September 18, 2017, plaintiff inspected the feed and noticed large

9  traces of corn mixed in, despite clear labeling claiming the product contained "no corn."  *Id.*

10  ¶¶ 19–20.  Three days later, on September 21, 2017, plaintiff purchased two additional bags of

11  Rabbit Feed from TSC Tractor Supply and, after further investigation, discovered these bags also

12  contained corn despite clear labeling stating otherwise.  *Id.* ¶¶ 22–23.  Plaintiff alleges the

13  presence of corn is significant because "it is well known by rabbit breeders that corn is very

14  dangerous" because it "can increase the risk of a toxic mold, which mimics rabies and can cause

15  death."  *Id.* ¶ 17.  Corn also is unhealthy because it can "cause [rabbits] to put on 'bad' fat[] and

16  have increased health issues."  *Id.*

17            Based on plaintiff's knowledge and belief, all bags of defendant's Rabbit Feed

18  during the relevant period displayed a label claiming the product contained no corn.  *Id.* ¶ 24.

19  Defendant's website similarly represented that its Select Series rabbit food products were corn-

20  free.  *Id.*  Despite these representations, plaintiff alleges defendant has been aware of the presence

21  of corn in its premium rabbit food products dating back to 2012, when consumer complaints

22  began.  *Id.* ¶ 25.  Defendant has continued to distribute and market these products as corn-free,

23  even though defendant was aware of consumer concerns.  *Id.* ¶ 26.  Nowhere on the relevant

24  products themselves or on the company website does defendant advise consumers its Rabbit Feed

25  contains corn.  *Id.* ¶¶ 31–32.  Plaintiff alleges defendant profits from this deceptive practice

26  because it charges a premium for its "Pro" series, corn-free formula, at approximately $17.99 per

27  bag, while competitors charge approximately $10 to $12 per bag for similar products and do not

28  claim the products are corn free.  *Id.* ¶ 28.   Plaintiff alleges that had defendant "properly

1  represented the contents/ingredients of the rabbit feed, Plaintiff would not have purchased the

2  feed[,]" and "no reasonable consumer who purchased or attempted to purchase the feed would

3  have known that, despite false representations, the feed actually did contain corn." *Id.* ¶¶ 37, 39.

4        **B.**    <u>Procedural Background</u>

5        Plaintiff initiated this action on January 30, 2018.  Compl., ECF No. 1.  After two

6  amendments, the operative second amended complaint makes three claims against defendant on

7  behalf of the class: (1) unfair and unlawful business practices in violation of California's unfair

8  competition law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, (2) fraudulent business

9  practices in violation of the UCL, and (3) violation of California's false advertising law ("FAL"),

10  Cal. Bus. & Prof. Code § 17500, *et seq.*  SAC ¶¶ 56–94.  The complaint alleges that, during the

11  relevant time period, defendant deceptively labeled its rabbit food product as containing no corn

12  and plaintiff relied on and was harmed by those deceptive practices.  *Id.* ¶¶ 36–39.  Plaintiff

13  invokes this court's jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C.

14  § 1332(d)(2), as the complaint alleges the class is comprised of at least 100 members, there is

15  minimal diversity and the aggregate value of class claims exceeds $5,000,000, exclusive of

16  interest and costs.  *Id.* ¶¶ 9–10.

17        On May 24, 2019, plaintiff notified the court the parties had reached a class-wide

18  settlement of claims.  ECF No. 38.  On October 25, 2019, plaintiff filed the operative motion

19  seeking court approval of the class-wide settlement and preliminary certification of the class.

20  Mot.  The court considers the motion here.

21  II.    <u>LEGAL STANDARD</u>

22        **A.**    <u>Preliminary Class Certification and Approval of Settlement Under Rule 23</u>

23        Where "parties reach a settlement agreement prior to class certification, courts

24  must peruse the proposed compromise to ratify both the propriety of the certification and the

25  fairness of the settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).

26  /////

27  /////

28  /////

1        1.      Preliminary Class Certification

2              Whenever it reviews class certification, the court owes "undiluted, even

3    heightened, attention" to certification requirements in the settlement context.  *Amchem Products,*

4    *Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Molski v. Gleich*, 318 F.3d 937, 946 (9th Cir. 2003),

5    *overruled on other grounds by Dukes v. Wal-Mart Stores, Inc. ("Dukes I")*, 603 F.3d 571 (9th

6    Cir. 2010); *see Berry v. Baca*, No. CV 01-02069 DDP, 2005 WL 1030248, at *7 (C.D. Cal. May

7    2, 2005) (the parties cannot merely "agree to certify a class that clearly leaves any one

8    requirement unfulfilled").  Preliminary certification is appropriate only if the class satisfies each

9    Rule 23(a) certification prerequisite.  Rule 23 requires that the class contain enough members, the

10   suit involves questions common to all class members, plaintiff's claims are typical of the class

11   members and plaintiff and her counsel fairly and adequately protect the class interests.  Fed. R.

12   Civ. P. 23(a)(1)–(4).  If Rule 23(a)'s threshold requirements are met, the proposed class must

13   satisfy Rule 23(b)(3)'s predominance and superiority requirements.  Fed. R. Civ. P. 23(b)(3); *see*

14   *Amchem*, 521 U.S. at 615.

15       2.      Preliminary Settlement Approval

16             If preliminary class certification is appropriate, the court must then examine the

17   propriety of settlement.  Rule 23 mandates that "[t]he claims, issues, or defenses of a certified

18   class . . . may be settled, voluntarily dismissed, or compromised only with the court's approval."

19   Fed. R. Civ. P. 23(e).  "Courts have long recognized that settlement class actions present unique

20   due process concerns for absent class members."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654

21   F.3d 935, 946 (9th Cir. 2011) (citation and internal quotation marks omitted).  When parties seek

22   approval of a settlement agreement negotiated prior to formal class certification, "there is an even

23   greater potential for a breach of fiduciary duty owed the class during settlement."  *Id.*

24   Accordingly, the reviewing court analyzes such agreements with "a more probing inquiry" for

25   evidence of collusion or other conflicts of interest than normally required under the Federal

26   Rules.  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other*

27   *grounds by Wal-Mart Stores, Inc. v. Dukes ("Dukes II")*, 564 U.S. 338 (2011); *see also*

28

4

*Bluetooth*, 654 F.3d at 946.  "Judicial review must be exacting and thorough."  Manual for Complex Litigation ("MCL") (Fourth) § 21.61 (2019).

To determine whether a proposed class action settlement is fair, reasonable and adequate, courts consider several factors, as relevant, including: (1) [T]he strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement.  *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944 (9th Cir. 2015) (quoting *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)); *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007) (noting, at preliminary approval stage, courts consider whether "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval . . . ." (citations omitted)).  These factors substantively track those provided in 2018 amendments to Rule 23(e)(2), under which the court may approve a settlement only after considering whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and

/////

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2)(A)−(D).

The amendment spelling out factors in Rule 23(e)(2) took effect on December 1, 2018 and, as an advisory note to the Rule 23(e) amendment recognizes, "each circuit has developed its own vocabulary for expressing [] concerns" regarding whether a proposed settlement is fair, reasonable and adequate.  Fed. R. Civ. P. 23(e)(2) adv. comm. note to 2018 amendment.  Accordingly, the newly codified factors are not intended "to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." *Id.*; *see also* 4 Newberg on Class Actions § 13:14 (5th ed.) (noting Rule 23(e) "essentially codified [federal courts'] prior practice").  Moreover, the Advisory Committee warned against allowing "[t]he sheer number of factors [to] distract both the court and the parties from the central concerns that bear on review under Rule 23(e)(2)."  Fed. R. Civ. P. 23(e)(2) adv. comm. note to 2018 amendment.  The court bears this admonition in mind in drawing on the Ninth Circuit's longstanding guidance and the Rule 23(e)(2) factors as relevant to resolve this motion.

III.   DISCUSSION

A.   Preliminary Certification of the Class Under Rule 23

1.   Rule 23(a) Requirements

a)   Numerosity

Under Rule 23(a)(1), numerosity means "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "This requirement 'does not mean that joinder must be impossible, but rather means only that the court must find that the difficulty or inconvenience of joining all members of the class makes class litigation desirable.'"  *Kutzman v. Derrel's Mini Storage, Inc.*, No. 1:18-CV-00755-AWI-JLT, 2020 WL 406768, at *5 (E.D. Cal. Jan. 24, 2020) (quoting *In re Itel Sec. Litig.*, 89 F.R.D. 104, 112 (N.D. Cal. 1981)).  Courts generally consider forty or more members sufficient to satisfy the numerosity requirement.  *Id.*

1   (citing *Collins v. Cargill Mean Solutions Corp.*, 274 F.R.D. 294, 300 (E.D. Cal. 2011);

2   *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)).

3         Here, plaintiff represents that the proposed class consists of approximately 1,583

4   purchasers of the relevant class products.[1]  Supp. Friedman Decl. ¶ 12, ECF No. 54.  This

5   estimate on its face demonstrates that joinder of putative class members would be impracticable.

6   The class satisfies the numerosity requirement of Rule 23(a)(1).

7                  b)     Commonality

8         Certification requires "questions of law or fact common to the class."  Fed. R. Civ.

9   P. 23(a)(2).  "The commonality requirement is construed liberally, and the existence of some

10  common legal and factual issues is sufficient."  *In re NJOY, Inc. Consumer Class Action Litig.*,

11  120 F. Supp. 3d 1050, 1096 (C.D. Cal. 2015) (citing *Jordan v. County of Los Angeles*, 669 F.2d

12  1311, 1320 (9th Cir. 1982)).  In the context of fraudulent advertising, commonality exists where it

13  is evident class members were exposed to a product's allegedly fraudulent packaging and their

14  alleged harm arose "from a common core of salient facts and pose[s] a common question."  *Id.*

15        Here, plaintiff asserts class claims "stem from the same factual circumstances,

16  specifically that Defendant allegedly mislabeled its Class Products as being 'corn free' when they

17  were not, during the Class Period."  Mot. at 17.  Plaintiff further asserts class claims present

18  common questions of law, including (1) whether defendant acted willfully and knowingly,

19  (2) whether a reasonable consumer would have found the mislabeling material to their purchase,

20  and (3) "whether a conjoint survey[2] could provide a reliable damages model for Class-wide

21  relief."  *Id.*  Because of this, class members all seek the same remedy.  *Id.*  Given that the

22  proposed class will consist of "all individuals in California who purchased" the Rabbit Feed

23  during the relevant class period, Settlement Agreement § 2.07, there is no question each member

---

24       [1] As defined by the proposed settlement agreement, the term "class products" means

25  "Select Series Pro Formula Rabbit Food, for which the packaging contained a representation
     stating: 'Contains No Corn', purchased between January 30, 2014 and May 14, 2019."

26  Settlement Agreement § 2.10.

27       [2] "Conjoint analysis is a statistical technique capable of using survey data to determine
     how consumers value a product's individual attributes—often called the market's willingness to

28  pay."  *In re NJOY*, 120 F. Supp. 3d at 1073 (citation omitted).

1    will have been exposed to the allegedly fraudulent packaging; thus, there is a commonality of law

2    and fact across all class members.  *See In re NJOY*, 120 F. Supp. 3d at 1097 (collecting cases in

3    which courts have found commonality where fraudulent packaging was alleged).  The

4    commonality prong is satisfied here.

5                          c)    <u>Typicality</u>

6               "[T]he claims or defenses of the representative parties [must be] typical of the

7    claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "The test of typicality 'is whether other

8    members have the same or similar injury, whether the action is based on conduct which is not

9    unique to the named plaintiffs, and whether other class members have been injured by the same

10   course of conduct.'"  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quoting

11   *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)).

12              Plaintiff contends her claims are typical of the class because all claims stem from

13   the same factual scenario: class plaintiffs purchased the Class Products, and in so doing, relied on

14   the packaging advertising the products as "corn free."  Mot. at 17–18.  All class members,

15   therefore, share in the claim that the Class Products were falsely advertised.  *Id.* at 18.  The court

16   finds the class here satisfies the typicality requirement.  All class members appear to have

17   suffered the same harm, the same conduct alleged by the representative plaintiff caused that harm

18   and the same course of conduct appears to have injured other class members.  Thus, the

19   representative's claims "are reasonably co-extensive with those of absent class members."

20   *Hanlon*, 150 F.3d at 1020.  Plaintiff meets the typicality requirements here.

21                          d)    <u>Adequacy</u>

22              Adequacy requires that "representative parties will fairly and adequately protect

23   the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "Courts are to inquire (1) whether the named

24   plaintiffs and counsel have any conflicts of interest with the rest of the potential class members

25   and (2) whether the named plaintiff and counsel will prosecute the action vigorously for the class

26   as a whole."  *Kutzman*, 2020 WL 406768, at *6 (citing *Hanlon*, 150 F.3d at 1020).

27              Class counsel Todd M. Friedman of the Law Offices of Todd M. Friedman, P.C.

28   seeks preliminary appointment as class counsel, and also moves to appoint Ashley Hale as class

8

1    representative.  Mot. at 18.  Ms. Hale "understand[s] the obligations of serving as a class

2    representative, [] adequately represent[s] the interests of the putative class, and has retained

3    experienced counsel."  *Id.*  Likewise, Mr. Friedman is qualified to represent class interests

4    because he has "extensive experience in consumer litigation, including the prosecution of class

5    actions under the CLRA, FAL, and UCL[,]" and has "vigorously" litigated this matter on behalf

6    of the class.  *Id.* 18–19.  Neither Ms. Hale nor Mr. Friedman have interests antagonistic to the

7    class or each other because all class members share a commonality of claims.  *Id.*  On these

8    representations, there appear to be no conflicts of interest among class members, the class

9    representative or class counsel.  Accordingly, the adequacy prong is satisfied.

10                              e)      Rule 23(a) Conclusion

11           For the reasons discussed, the court finds the class meets the numerosity,

12   commonality, typicality and adequacy requirements of Rule 23(a).  The court next turns to Rule

13   23(b)'s predominance and superiority requirements.

14                       2.      Rule 23(b) Requirements

15           Where plaintiff seeks class certification under Rule 23(b)(3), as here, she must

16   show: (1) "that questions of law or fact common to class members predominate over any

17   questions affecting only individual members, and [(2)] that a class action is superior to other

18   available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.

19   23(b)(3).  "The test of Rule 23(b)(3) is 'far more demanding,' than that of Rule 23(a)."  *Kutzman*,

20   2020 WL 406768, at *7 (quoting *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1172

21   (9th Cir. 2010)).

22                              a)      Predominance

23           "The predominance analysis focuses on 'the legal or factual questions that qualify

24   each class member's case as a genuine controversy' to determine 'whether proposed classes are

25   sufficiently cohesive to warrant adjudication by representation.'"  *Robinson v. OnStar, LLC*, No.

26   15-CV-1731 JLS (MSB), 2020 WL 364221, at *16 (S.D. Cal. Jan. 22, 2020) (quoting *Amchem*,

27   521 U.S. at 623).  "'Considering whether questions of law or fact common to class members

28   predominate begins . . . with the elements of the underlying cause of action.'"  *Id.* (alteration in

                                          9

1   original) (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)).  "The

2   requirement is satisfied if a plaintiff establishes that a 'common nucleus of facts and potential

3   legal remedies dominates the litigation.'"  *Kutzman*, 2020 WL 406768, at *7 (citing *Hanlon*, 150

4   F.3d at 1022).

5           Here, plaintiff characterizes the predominance inquiry this way: "[W]hether

6   Defendant violated the CLRA,[3] UCL, FAL by falsely advertising that Class Products were 'corn

7   free' when, as Plaintiff alleges, the products did contain corn."  Mot. at 19.  These common

8   questions, plaintiff asserts, justify a predominance finding because they "'present a significant

9   aspect of the case . . . [that] can be resolved for all members of the class in a single

10  adjudication.'"  *Id.* (quoting *Hanlon*, 150 F.3d at 1022).  Beyond this conclusory assertion,

11  plaintiff provides no additional evidence at this point to justify a predominance finding.  While

12  plaintiff's contentions are thin, they are nonetheless sufficient to satisfy the predominance

13  standard for the purpose of preliminary approval given the detailed allegations in the complaint.

14  *See Nucci v. Rite Aid Corp.*, No. 19-CV-01434-LHK, 2020 WL 3187335, at *15 (N.D. Cal. June

15  14, 2020) ("[P]laintiffs need not show at the certification threshold that predominant questions

16  will be answered in their favor." (citing *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568

17  U.S. 455, 468 (2013)).  The court will, however, require greater detail on the question of

18  predominance at the final approval stage.

19          The complaint makes out two claims under the UCL—one for unfair and unlawful

20  violations and one for fraudulent violations—and another claim for violations under the FAL.

21  SAC ¶¶ 56–94.  "California's UCL 'prohibits any unlawful, unfair or fraudulent business act or

22  practice.'"  *L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*, 114 F. Supp. 3d 852, 860 (N.D. Cal. 2015)

23  (some internal quotation marks omitted) (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934,

24  938 (9th Cir. 2008)).  While "[t]he FAL 'prohibits any unfair, deceptive, untrue, or misleading

25  advertising.'"  *Id.* (quoting *Williams*, 552 F.3d at 938).  Claims under the UCL, FAL and the

26  CLRA—with the latter forming the predicate offense for plaintiff's unfair and unlawful UCL

27  _____

28          [3] CLRA refers to the Consumers Legal Remedies Act, California Civil Code § 1770, *et seq.*

1    claim—are all "governed by the 'reasonable consumer' test." *Williams*, 552 F.3d at 938 (quoting

2    *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995)).  Under that test, plaintiff must "show

3    that members of the public are likely to be deceived." *Id.* (internal quotation marks and citation

4    omitted).

5              Plaintiff alleges defendant's conduct was unlawful and unfair because it "devised

6    and executed a scheme to mislead consumers about the quality of the ingredients in its rabbit feed

7    products." *Id.* ¶ 59.  Plaintiff further alleges defendant acted unlawfully and unfairly by

8    preventing plaintiff and class members from making purchasing decisions on the basis of

9    competitive factors in the marketplace, causing plaintiff and class members to purchase rabbit

10   food they would not have otherwise purchased, and which had substantially less value than

11   advertised. *Id.* ¶ 64.  The complaint also alleges that to induce rabbit food purchasers,

12   "Defendant made misleading statements in its advertisements that deceived Plaintiff and Class

13   Members and reinforced its [sic] reasonable expectation and belief about the quality of its

14   ingredients." *Id.* ¶ 70.  Finally, plaintiff alleges "[a] reasonable consumer would expect that they

15   would be able to rely on the specific representations about the quality of the feed," thus creating

16   "a strong tendency and likelihood to deceive reasonable consumers." *Id.* ¶¶ 71, 75; *see also id.*

17   ¶ 91 ("Defendant deliberately provided false representations and omissions to deceive reasonable

18   consumers."); *id.* ¶ 92 ("Defendant's false and misleading advertising of Class Products deceived

19   the general public.").  For these alleged harms, plaintiff and class members seek equitable relief

20   in the form of restitution, declaratory and injunctive relief, interest on monies derived from the

21   deceptive acts and an award of reasonable attorneys' fees. *Id.* ¶¶ 66, 86, 94.

22             These allegations establish a common nucleus of facts and potential legal remedies

23   that dominate the litigation.  All class members share in their exposure to the allegedly deceptive

24   packaging, acted on that allegedly deceptive packaging by purchasing a product they would not

25   have otherwise purchased, were harmed through loss of money expended during the transaction,

26   and all seek common equitable and declaratory relief.  These allegations satisfy the predominance

27   standard here.

28

b)     <u>Superiority</u>

The court must also consider: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)–(D). "Where the parties have agreed to pre-certification settlement[, factors] (d) and perhaps (c) are irrelevant." *Kutzman*, 2020 WL 406768, at *8 (citing *Amchem*, 521 U.S. at 620; *Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 473 (E.D. Cal. 2010)). "Judicial economy weighs in favor of a class action where, as here, liability turns on whether advertisements were false or misleading." *Johns v. Bayer Corp.*, 280 F.R.D. 551, 559 (S.D. Cal. 2012).

Plaintiff contends factors (A), (B) and (C) favor class certification because "any Settlement Member who wishes to pursue a separate action can opt out," there is no "competing litigation regarding claims at issue" and the parties agree the forum is appropriate. Mot. at 21. At this juncture the court is satisfied superiority factors (A), (B) and (C) are met given the proposed settlement amount and the anticipated class size. On January 31, 2020, class counsel, Todd Friedman, filed a supplemental declaration providing greater detail regarding the anticipated class size after the completion of confirmatory discovery. Supp. Friedman Decl. ¶¶ 4–6. Based on data from third-party retailers regarding potential class members, who are California consumers, plaintiff estimates the class will consist of approximately 1,583 individuals whose contact information is known and ascertainable. *Id.* ¶¶ 7–12. Assuming all eligible class members submit a valid claim against the $62,500 class settlement, individual recovery will be approximately $39 per class member. *Id.* ¶ 13. This is a fair and reasonable recovery considering the retail value of the Rabbit Feed is in the range of $11 to $17 per unit. *Id.* Attorneys' fees, costs of suit and costs of the proposed incentive award will not affect this projected recovery per class member, as defendant has agreed to pay these additional amounts separately from the $62,500 settlement. *Id.* Even where multiple purchases will entitle individual class members to a greater pro rata share of the settlement fund, it is highly unlikely the total value of their individual

1    claims would justify pursuing those claims separately given the relatively modest potential award

2    compared to the high cost of litigation.  *See Wolin*, 617 F.3d at 1175 ("Where recovery on an

3    individual basis would be dwarfed by the cost of litigating on an individual basis, this factor

4    weighs in favor of class certification.").  For these reasons, the class satisfies the superiority

5    requirement of Rule 23(b).

6                            c)      Rule 23(b) Conclusion

7               For the reasons discussed above, the predominance and superiority requirements of

8    Rule 23(b) are satisfied.

9                     3.      Overall Conclusion

10              In sum, the requirements of Rule 23(a) and (b) are met.  The court conditionally

11   certifies the following class:

12              [A]ll individuals in California who purchased one or more units of
                Select Series Pro Formula Rabbit Food, for which the packaging
13              contained a representation which stated: "Contains No Corn"
                between January 30, 2014 to May 14, 2019 (the "Class Period").
14              Excluded from the Class are any employees of Defendant, its parents,
                affiliates, or subsidiaries; the Judge or Magistrate Judge to whom the
15              Action is assigned; and, any member of those Judges' staffs or
                immediate families.
16

17   Settlement Agreement § 2.07.

18              With the class preliminarily certified, the court turns next to the fairness of the

19   proposed settlement.

20        B.      Preliminary Fairness Determination of Settlement Agreement

21              This court has joined others that reject "the idea that district courts should conduct

22   a more lax inquiry at the preliminary approval stage seems wrong" and lacks any compelling

23   rationale.  *See Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1035–36 (N.D. Cal. 2016).  Rather, in

24   light of the court's duty to absent class members, the court should "review class action

25   settlements just as carefully at the initial stage as [it] do[es] at the final stage."  *See id.* at 1037;

26   *see also Stoddart v. Express Servs.*, No. 2:12-cv-01054-KJM-CKD, 2019 WL 414489, at *5 (E.D.

27   Cal. Feb. 1, 2019) (stating this court's agreement with principle set forth in *Cotter*); *Smothers v.*

28

1   *Northstar Alarm Servs.*, LLC, No. 2:17-cv-00548-KJM-KJN, 2019 WL 280294, at *10 (E.D. Cal.

2   Jan. 22, 2019) (same).

3           At the preliminary approval stage, the "initial evaluation can be made on the basis

4   of information [contained in] briefs, motions, or informal presentations by parties."  MCL

5   § 21.632.  The court may not "delete, modify or substitute certain provisions."  *Hanlon*, 150 F.3d

6   at 1026 (citations and quotation marks omitted). "The settlement must stand or fall in its entirety."

7   *Id.*

8           With these principles in mind, the court turns to the terms of the proposed

9   settlement agreement.

10              1.      Proposed Settlement Agreement

11          The proposed settlement agreement resulted from participation in a mediation

12   session before the Honorable James P. Gray (Ret.) of ADR Services Inc. and further settlement

13   discussions thereafter.  Mot. at 1.  As part of the settlement, defendant agrees to pay a total of

14   $62,500 on a claims-made basis to class members, with each eligible class member receiving a

15   pro rata share of the total, to resolve the action and obtain release of all Released Claims[4] in favor

16   of defendant and the released parties.  Settlement Agreement § 5.01.  Class members eligible to

17   receive a pro rata share of the settlement fund will receive a one-time distribution payment by

18   way of a check issued by the settlement administrator.  *Id.* § 5.03.  As noted above, the defendant

19   will pay attorneys' fees, costs and make payment to the class representative separate and apart

20   from defendant's compensation to the class.  *Id.* § 6.01.

21          The claims administrator, Simpluris, Inc., will be responsible for all matters

22   relating to the administration of the settlement, and defendant also shall pay all costs associated

23   with settlement administration, separate and apart from the total settlement fund.  *Id.* §§ 2.06,

24   8.01, 8.02.  To ensure adequate notice to all potential class members, the claims administrator

25   will create a settlement website containing all pertinent information related to the class

26

27          [4] The settlement agreement defines "Released Claims" as those "claims released in
     Section XVI."  Settlement Agreement § 2.25.  Section XVI provides a detailed description of
28   what claims constitute a "Released Claim" for purposes of settlement.  *Id.* § 16.01–16.02.

settlement, disseminate notice by first-class mail to the physical addresses of potential class members provided by defendant and maintain a toll-free telephone number for receiving calls related to the settlement. *Id.* §§ 9.01, 9.02, 9.04. The class administrator must also provide notice in compliance with the CAFA. *Id.* § 9.05.

Each class member, as defined by section 2.07, who does not timely and validly request exclusion from the settlement class will be eligible to submit a claim form. The claim period will remain open for 120 days after entry of this preliminary approval order. *Id.* § 10.02. The settlement forecloses from receiving benefit or relief under the settlement agreement any class members who do not timely exclude themselves from the settlement class or file a claim form. *Id.* But also, such class members will be bound together with all settlement class members by all terms of the settlement agreement and release, including the terms of the court's final approval order once issued, and barred from bringing any action against any of the released parties concerning the released claims. *Id.*

When a class member submits a claim, the class administrator will review the claim for sufficiency and validity. *Id.* § 11.01. Class counsel and defense counsel will resolve questions and disputes regarding the validity of claims. *Id.* Once final claim verification occurs and settlement checks are mailed, the claims administrator will provide notice on the settlement website that all consideration due under the settlement has been paid. *Id.* § 11.02. The class administrator will mail settlement checks no later than fifty days after the effective date, when the judgment becomes final, and if any check is returned, the claims administrator will conduct a thorough investigation for that class member's proper mailing address. *Id.* § 11.03. If, upon obtaining a new mailing address, a class member's settlement check is returned for a second time, the claims administrator need not conduct further investigation into an alternative address. *Id.* Thereafter, unclaimed checks will be negotiable for a period of 180 days after issuance. *Id.* Any funds resulting from unclaimed or uncashed settlement checks will be paid to the California State Controller's Office: Unclaimed Property in the name of each respective class member. *Id.*

Any class members wishing to opt out of the settlement must notify the claims administrator in writing of such intent by the opt out deadline. *Id.* § 12.01. As discussed, class

members who fail to timely opt out of the settlement agreement will be bound by its terms.  Any disputes regarding whether a class member has effectively opted out will be resolved by agreement of the parties, with the court retaining jurisdiction over any unresolved and disputed exclusion requests.  *Id.* § 12.01(D).  Any class member wishing to object to the fairness of the settlement must submit a written objection to the court in accordance with the schedule set forth in the settlement agreement and must simultaneously provide a copy to class counsel and defense counsel.  *Id.* § 12.02.

Finally, the settlement agreement also contains a standard release of parties and claims, waiver of unknown claims and a covenant not to sue.  *Id.* §§ 16.01, 16.02.

## 2. Fairness, Reasonableness and Adequacy

As noted above, at this preliminary approval stage, the court considers the factors set out in Rule 23(e)(2)(A)−(D).  These factors generally focus on whether the proposed settlement is "the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval."  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (citations and quotation marks omitted).  Courts often begin by examining the process that led to the settlement's terms to ensure those terms are the result of vigorous, arms-length bargaining and then turn to the substantive terms of the agreement.  *See id.* at 1080 ("[P]reliminary approval of a settlement has both a procedural and a substantive component.").  These factors favor approval here.

### a) Settlement Process: Arm's Length Negotiations

Although both parties strongly believe in the merits of their respective positions, they "carefully balanced the risks of continuing to engage in protracted and contentious litigation, against the benefits to the Class."  Mot. at 14.  This risk assessment compelled the parties toward settlement, which occurred as a "result of intensive arms-length negotiation, including an all-day mediation session before the Hon. James Gray (ret.) on May 14, 2019."  Mot. at 15.  With Judge Gray facilitating, the parties reached a settlement agreement that "reflects a compromise between avoiding [protracted litigation] and the risk that the class might not recover."  *Id.* at 14–15.  Class

counsel supports the propriety of settlement given the information defendant produced during

discovery, Mot. at 15, with that information later refined during the confirmatory discovery

process, Supp. Decl. Friedman ¶ 14.  Plaintiff asserts that "[t]he time and effort spent examining

and investigating the claims militate in favor of preliminary approval of the proposed Settlement,

as the process strongly indicates that there was no collusion."  Mot. at 16.  The court agrees these

circumstances favor approval.  *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir.

2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated

resolution."); *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528

(C.D. Cal. 2004) ("A settlement following sufficient discovery and genuine arms-length

negotiation is presumed fair.").

b)   Adequacy of the Agreement

The court next considers the substance of the agreement to determine whether the

settlement falls within the range of possible approval.  "To evaluate the range of possible

approval criterion, which focuses on substantive fairness and adequacy, courts primarily consider

plaintiffs' expected recovery balanced against the value of the settlement offer."  *Harris v. Vector

Mktg. Corp.*, No. C-08-5198 EMC, 2011 WL 1627973, at *9 (N.D. Cal. 2011) (internal citation

and quotation marks omitted).  This inquiry may involve consideration of the uncertainty class

members would face if the case were litigated to trial.  *See Ontiveros v. Zamora*, Civ. No. 2:08-

567 WBS DAD, 2014 WL 3057506, at *14 (E.D. Cal. July 7, 2014).

Here, plaintiff asserts that "[b]ecause of the costs, risks to both sides, and delays of

continued litigation, the Settlement presents a fair and reasonable alternative to continuing to

pursue the Litigation."  Mot. at 15.  As discussed above, through confirmatory discovery plaintiff

identified approximately 1,583 individuals whose contact information is known and ascertainable,

who comprise the proposed class.  Supp. Friedman Dec. ¶ 12.  If each known class member

makes a claim on the $62,500 settlement fund, the individual recovery rate will be approximately

$39.00 per class member.  *Id.* ¶ 13.  Class counsel states this represents "an excellent recovery for

the class, given that the products retail from between $11–$17 per bag."  *Id.*  Class counsel

"strongly advocate[s] that [the settlement] should be approved by the [] Court."  *Id.* ¶ 14.

The court finds preliminarily that the proposed settlement represents a fair and reasonable outcome.  In weighing plaintiff's recovery as originally contemplated against the settlement value, the court finds little disparity.  *Harris,* 2011 WL 1627973, at *9.  Initial discovery revealed that defendant sold approximately 15,367 units nationwide during the class period for a gross revenue of $111,926.42.  Mot. at 1.  As expected, subsequent discovery revealed that of the nationwide sales, California sales represented a much smaller portion, roughly 10 percent (1,583 ÷ 15,367 = 10.3%).  Supp. Friedman Decl. ¶ 12.  Even assuming a 100 percent claim rate by the 1,583 class members, the recovery per claimant is approximately $39.  *Id.* ¶ 13.  Compared to the product's average retail value of $11 to $17 per unit, $39.00 represents at least a double recovery per unit.  The average recovery rate per claimant will increase if less than the total number of estimated class members participate in the settlement.  The sums to be distributed to class members represent a substantial recovery given the theories of liability asserted in this action.  *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 368 (N.D. Cal. 2018) ("It is well-established that the price premium attributable to an alleged misrepresentation on product labeling or packaging is a valid measure of damages in a mislabeling case under the FAL, CLRA, and UCL." (internal quotation marks omitted)).  Finally, the per unit recovery rate is particularly reasonable compared to the time, expense and risk of further litigation.  For these reasons, the proposed settlement is "within the range of possible approval."  *In re Tableware*, 484 F. Supp. 2d at 1080.

3.   Other Fairness Considerations

Under the rubric of Rule 23(e)(2), courts will also consider the extent of discovery completed, the experience and views of counsel and the range of reasonableness, which also requires considering collusion, deficiencies in the proposed settlement and any preferential treatment.  Each of these factors favor preliminary approval of settlement here.  *See Kutzman*, 2020 WL 406768, at *11–14.

As for discovery, "The Court should lean in favor of a settlement where evidence is presented that a considerable amount of discovery has been conducted 'because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues

18

1   surrounding the case.'" *Id.* at \*11 (quoting *Adoma*, 913 F. Supp. 2d at 977).  Here, as reviewed

2   above, initial discovery revealed approximately 15,367 units sold, and thus a potential nationwide

3   class of that size.  Mot. at 1; Friedman Decl. ¶ 3.  However, because the proposed class now

4   comprises only California purchasers, subsequent confirmatory discovery revealed a potential

5   class size of approximately 1,583 members.  Supp. Friedman Decl. ¶ 12.  Responses to two

6   rounds of subpoenas to third-party retailers identified by defendant allowed plaintiff to calculate

7   this number.  *Id.* ¶ 5.  Thereafter, meet and confer efforts with counsel and sales data regarding

8   class products from retailers such as Walmart, Ace Hardware, True Value Hardware, Animal

9   Health International and other small retailers narrowed the scope of potential class members to an

10  ascertainable value.  *Id.* ¶¶ 6–7.  Finally, the parties' participation in the full-day mediation

11  guided by a seasoned mediator, Judge Gray, signals the parties fully considered the strengths and

12  weaknesses of their respective positions and reached an amicable resolution with those

13  considerations in mind.  Mot. at 15.  The court finds for purposes of this motion that the parties

14  reached a settlement agreement after extensive discovery and guided by a full understanding of

15  the legal and factual issues controlling the case.

16          Moreover, where class counsel has significant experience, his or her

17  recommendation should be accorded considerable weight.  *Kutzman*, 2020 WL 406768, at \*11

18  (citing *DIRECTV, Inc.*, 221 F.R.D. at 528).  Here, class counsel "has extensive experience in class

19  actions, as well as particular expertise in class actions relating to consumer protection and

20  specifically the CLRA, UCL, and FAL."  Mot. at 16; *see* Friedman Decl. ¶ 59 (listing various

21  consumer rights matters in which class counsel served as plaintiff's counsel, including in various

22  class action matters).  Class counsel "strongly advocate[s]" that the settlement be approved

23  because it "represents an outstanding result for the Class."  Supp. Friedman Decl. ¶ 14.  The court

24  finds class counsel's experience and recommendation favor settlement approval.

25          Finally, before the court can approve the proposed settlement, it must check for the

26  existence of collusion, deficiencies or preferential treatment.  "The goal is to ensure that the class

27  representatives and their counsel do not receive a disproportionate benefit 'at the expense of the

28  unnamed plaintiffs who class counsel had a duty to represent.'"  *Kutzman*, 2020 WL 406768, at

1   *12 (quoting *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012)).  To detect

2   unreasonableness in a proposed settlement, the Ninth Circuit has advised courts to look for the

3   following signs:

4       (1) [W]hen counsel receive a disproportionate distribution of the
5   settlement, or when the class receives no monetary distribution but
    class counsel are amply rewarded, (2) when the parties negotiate a
    clear sailing arrangement providing for the payment of attorneys'
6   fees separate and apart from class funds, which carries the potential
    of enabling a defendant to pay class counsel excessive fees and costs
7   in exchange for counsel accepting an unfair settlement on behalf of
    the class, [and] (3) when the parties arrange for fees not awarded to
8   revert to defendants rather than be added to the class fund.

9   *Bluetooth*, 654 F.3d at 947 (internal quotation marks and citations omitted).

10      Here, plaintiff asserts there was no collusion as the parties reached an agreement

11  after extensive discovery and arms-length negotiations guided by an experienced mediator.  Mot.

12  at 15.  Additionally, plaintiff contends the proposed attorneys' fees of $125,000 are appropriate as

13  they "were negotiated separate and apart from the settlement amount, demonstrating there is no

14  collusion," and the "arrangement was carefully negotiated with the guidance" of the mediator.

15  Mot. at 11.  "The Parties believe this was both the most equitable approach to the Parties . . .

16  [and] the most ethical way of approaching the award of attorney's fees with respect to fairness for

17  the Class."

18      While the court has discretion in a common fund case, such as this, to apply either

19  of the Ninth Circuit's approved methods for evaluating attorneys' fees—the "lodestar" method or

20  the "percentage of the fund" method, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir.

21  2002)— "the ultimate goal is to 'reasonably compensate counsel for their efforts in creating the

22  common fund.'"  *Shelby v. Two Jinns, Inc.*, No. CV 15-03794-AB (GJSx), 2017 WL 6347090, at

23  *8 (C.D. Cal. Aug. 2, 2017) (quoting *In re Omnivision Techs. Inc.*, 559 F. Supp. 2d 1036, 1046

24  (N.D. Cal. 2008)), *modified sub nom. Shelby v. Two Jinn, Inc.*, No. 2:15-CV-03794-AB-GJS,

25  2018 WL 4191405 (C.D. Cal. June 25, 2018).

26      On the current record, the court is skeptical the $125,000 attorneys' fee award

27  accurately represents counsel's efforts in this matter.  Rather, the arrangement appears to closely

28  reflect the scenario of which *Bluetooth* warns: "when the parties negotiate a 'clear sailing'

arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries 'the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class.'" *Bluetooth*, 654 F.3d at 947 (quoting *Lobatz v. U.S. W. Cellular of California, Inc.*, 222 F.3d 1142, 1148 (9th Cir. 2000)).  The record is devoid of factual and documentary support showing that the negotiated fee reasonably compensates class counsel for his efforts.  The proposed award appears particularly problematic in light of the typical common fund benchmark of 25 percent, *Hanlon*, 150 F.3d at 1029, and the amount of the settlement fund itself: the proposed $125,000 fee award is double the value of the $62,500 settlement fund.  The court cautions counsel that it will not approve such an award at the final stage of this litigation without substantial justification.

Nonetheless, at this preliminary stage, the lack of support for the proposed award of attorneys' fees need not prevent preliminary approval. *See, e.g.*, *Aikens v. Malcolm Cisneros*, No. 5:17-CV-02462-JLS-SP, 2019 WL 3491928, at *9 (C.D. Cal. July 31, 2019) (granting preliminary approval despite "the lack of information regarding attorneys' fees" and noting the court will have opportunity to "scrupulously examine Class Counsel's requested hours and rates" before final approval).  No additional red flags appear to weigh against preliminary approval. There are no concerns that funds will revert to defendant because unawarded fees will be paid to the California State Controller's Office.  The completion of extensive discovery and arms-length, mediator-guided negotiations all suggest the settlement agreement is not the product of collusion.

Finally, at this stage, the proposed representative award does not foreclose preliminary approval although the court has reservations here as well.  The settlement agreement states that Hale, as class plaintiff, "agrees that her request for an incentive award shall not exceed $7,500," and "Defendant shall not object to any request . . . for an incentive award that is consistent with this Section."  Settlement Agreement § 6.02.  Generally, incentive awards in the $5,000 range are presumptively reasonable. *See Hopson v. Hanesbrands Inc.*, No. CV-08-0844 EDL, 2009 WL 928133, at *10 (N.D. Cal. Apr. 3, 2009) (collecting cases and explaining "[i]n general, courts have found that $5,000 incentive payments are reasonable").  Whatever the amount, courts must exercise skepticism and consider a proposed award against costs actually

21

incurred, the time expended by the representative plaintiff and fairness of the hourly rate. *See Torchia v. W.W. Grainger, Inc.*, 304 F.R.D. 256, 280 (E.D. Cal. 2014); *see also Esparza v. SmartPay Leasing Inc.*, No. C 17-03421 WHA, 2020 WL 465865, at *3 (N.D. Cal. Jan. 28, 2020) (considering request for $2,500 incentive award but granting only $100 award for class representative's actual out-of-pocket expenses).  Moreover, an incentive award must be modest compared to the total settlement fund. *See, e.g.*, *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 463 (E.D. Cal. 2013) (awarding incentive fee equaling approximately .62 percent of the total settlement fund).  Here, though the representative award will be paid separately from the total settlement fund, a $7,500 incentive award could nonetheless constitute a windfall as it represents 12 percent of the total settlement fund ($7,500 ÷ $62,500 = .12 or 12%).  The court is not inclined to grant such a generous award absent substantial justification. *See generally* Hale Decl., ECF No. 45-2.  Still, as with attorneys' fees, the court's concerns do not at this point impede preliminary settlement approval as the court will critically examine the proposed award at the final approval stage and exercise its discretion to grant the award it sees fit. *See Kutzman*, 2020 WL 406768, at *13 (expressing concerns regarding incentive award but preliminarily approving settlement because of opportunity to further examine prior to final approval).  In seeking final approval, plaintiff must provide a detailed accounting, including declarations and other supporting documentation, to justify the proposed representative award.

With these cautionary advisements, the court finds that additional fairness considerations do not weigh against preliminary approval at this time.

### 4.    Conclusion Regarding Preliminary Fairness

Although the court has reservations regarding the attorneys' fees award and the recommended incentive award, it finds, nonetheless, that the settlement agreement appears fair and therefore warrants preliminary approval.  At the final approval stage, however, plaintiff will need to address the court's concerns in significant detail to obtain approval.

/////

/////

/////

22

1      C.    <u>Notice</u>

2          1.    <u>Notice Content and Form</u>

3      "The court must direct notice in a reasonable manner to all class members who

4  would be bound by the propos[ed] [settlement] . . . ." Fed. R. Civ. P. 23(e)(1)(B). "The absent

5  class members must be provided with notice, an opportunity to be heard, and a right to opt-out of

6  the class." *Kutzman*, 2020 WL 406768, at \*14 (citing *AT&T Mobility LLC v. Concepcion*, 563

7  U.S. 333, 349 (2011)). Under Rule 23's provision for notifying class members of class

8  certification, the notice must state in plain, easily understood language:

9            (i) the nature of the action; (ii) the definition of the class certified;
(iii) the class claims, issues, or defenses; (iv) that a class member

10            may enter an appearance through an attorney if the member so
desires; (v) that the court will exclude from the class any member

11            who requests exclusion; (vi) the time and manner for requesting
exclusion; and (vii) the binding effect of a class judgment on

12            members under Rule 23(c)(3).

13  Fed. R. Civ. P. 23(c)(2)(B)(i). Both notice content and form must be approved by the court.

14  *Kutzman*, 2020 WL 406768, at \*14 (citing *Monterrubio*, 291 F.R.D. at 452).

15      Here, the proposed notice to potential class members is sufficient in both content

16  and form. The settlement agreement states that the claims administrator shall post on the

17  settlement website a "Long Form Notice" in the form of Exhibit B attached to the agreement.

18  Settlement Agreement § 9.01(b); *see also id.*, Ex. B ("Long Form Notice"). The Long Form

19  Notice explains in clear and simple detail, among other things, the nature of a class action dispute,

20  what this specific dispute involves, why potential members are receiving notice, what members'

21  individual rights are and where members can obtain more information regarding the settlement.

22  *See generally* Long Form Notice. The Long Form Notice also clearly explains how potential

23  members can exclude themselves from the class. *Id.* ¶ 12. The settlement agreement provides

24  that the claims administrator will provide notice by mail using a double-sided postcard in the

25  form of Exhibit C attached to the agreement. Settlement Agreement § 9.02(b) & Ex. C ("Postcard

26  Notice"). The Postcard Notice states in clear, capitalized typeface "YOUR LEGAL RIGHTS

27  MAY BE AFFECTED BY THIS SETTLEMENT. PLEASE READ THIS NOTICE

28  CAREFULLY." Postcard Notice at 1. The notice goes on to explain that only members of the

settlement class are eligible to share in the settlement award and that to determine eligibility, potential class members should consult the Long Form Notice on the settlement website or call the designated toll-free number. *Id.* Both the website address and toll-free number are provided. *Id.* The Postcard Notice contains an easy-to-follow three step claim process in which potential claimants provide their personal information, enter and certify their specific claim, then follow instructions on how to submit the claim form. *Id.* at 1–2. The Postcard Notice also contains a second insert providing greater detail regarding the nature of the settlement, claim eligibility and claimants' individual rights, including the right to opt out of the settlement. *Id.* at 3. These proposed notice methods provide adequate notice to potential class members and explain, in sufficient detail, their individual rights under the law.

Accordingly, the court approves the proposed notice plan as detailed in paragraphs 6.1 through 6.10 of the settlement agreement.

### 2. Notice Schedule

The court finds the proposed notice schedule set forth in the settlement agreement is appropriate. The schedule shall be implemented as set forth in the settlement agreement, and the date of entry of this order shall be deemed July 1, 2020 for such purposes.

## IV. CONCLUSION

For the reasons set forth above, the court orders as follows.

1. Plaintiff's motion for preliminary class certification and preliminary settlement approval, ECF No. 45, is GRANTED;

2. The settlement class is conditionally certified for purposes of settlement only and is defined as:

> All individuals in California who purchased one or more units of Select Series Pro Formula Rabbit Food, for which the packaging contained a representation which stated: "Contains No Corn" between January 30, 2014 to May 14, 2019 (the "Class Period"). Excluded from the Class are any employees of Defendant, its parents, affiliates, or subsidiaries; the Judge or Magistrate Judge to whom the Action is assigned; and, any member of those Judges' staffs or immediate families;

24

3.      The notice plan set forth in the settlement agreement is approved;

4.      The parties shall implement the schedule as to notice, briefing and such set forth in the settlement agreement and the entry date of this order shall be deemed July 6, 2020 for such purposes;

5.      The court appoints Simpluris, Inc. to serve as the settlement administrator according to the terms of the settlement agreement;

6.      The Law Offices of Todd M. Friedman, P.C. is appointed class counsel in this action; and

7.      Plaintiff Ashley Hale is designated as the class representative in this action; A final approval hearing is set for December 11, 2020 at 10:00 AM in Courtroom 3, with briefs and supporting documentation due not less than 28 days prior.  Any class member who timely objects using the procedures detailed above may present objections in person at the fairness hearing, with counsel if he or she wishes.

IT IS SO ORDERED.

DATED:  July 6, 2020.

_____
CHIEF UNITED STATES DISTRICT JUDGE